# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| PAMELA J. FINK,<br><br>   Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>   Defendant. | No. C08-3015-PAZ<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

This matter is before the court for judicial review of the defendant's decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The plaintiff Pamela J. Fink filed her application on October 21, 2003, alleging a disability onset date of December 26, 2002. Her claim was denied initially and on reconsideration. She had a hearing before an Administrative Law Judge ("ALJ") on January 6, 2006, at which she amended her alleged onset date to April 15, 2003. On June 21, 2006, the ALJ issued his decision, finding that although Fink could not return to any of her past relevant work, she retained the functional capacity to perform other work, and she therefore was not disabled at any time through the date of the decision.

Fink filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. She argues the ALJ erred in finding her subjective complaints not to be fully credible. *See* Doc. Nos. 12 & 14. On August 12, 2008, with the parties' consent, Judge Donald E. O'Brien transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The issue before the court is whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Fink was born in 1961, and was forty-four years old at the time of the ALJ hearing. She is 5'1" tall and weighs around 300 pounds. She worked from 1981 to 2003 as a housekeeping supervisor at a care facility, a job she performed at a light to medium skill level. The job required her to lift up to ten pounds frequently and twenty pounds occasionally. She supervised eight employees, and hired and fired employees.

Fink claims she is unable to work due to a seroma[1] in her stomach, arthritis in her knees and back, irritable bowel syndrome, incontinence, and depression. Fink developed the seroma after a hysterectomy and left-sided-oophorectomy in December 2002. The surgery was performed to remedy ongoing menorrhagia and urinary incontinence. Preoperative history indicates Fink had "a long history of anxiety," for which she was not being treated, and "a history of depression," for which she was being treated with medication. *See* A.R. 161. Fink attempted to return to her job in March 2003, but she was only able to work off-and-on for about a month before she had to stop working due to abdominal pain and an infection in her incision. At an April 11, 2003, evaluation, she was complaining of irritable bowel, a hiatal hernia, reactive airway disease, depression/anxiety, and osteoarthritis affecting primarily her knees and low back. She was using an Albuterol inhaler two to three times daily for breathing difficulties, and she was

---

[1] A seroma is "a tumor-like collection of serum in the tissues." *Dorland's Illustrated Medical Dictionary*, 1511 (27th ed. 1988).

taking Lortab for abdominal pain, Paxil for depression, Tylenol for arthritis symptoms, Rolaids for GERD, and Augmentin for a sinus infection. She was scheduled for surgery on April 16, 2003, to remove the necrotic tissue from her lower abdomen. Following the surgery, she continued to take pain medications and antibiotics. Her drain was removed on May 20, 2003, and treatment notes indicate her wound was healing nicely, although "a firm healing ridge" was observed. A.R. 181. On May 27, 2003, her wound was noted to be healing well, but with "a slight area of firmness" still noted. Fink was having less pain and she was released to "resume activities as tolerated." A.R. 180.

On July 8, 2003, Fink was seen for followup of her incision. There was still "a significant healing ridge of the incision," and ultrasound showed multi-loculated fluid that was not amenable to aspiration at that time. Fink complained of low back and joint discomfort, and it was recommended that she lose weight and consider a gastric bypass procedure. Fink continued to take Lortab for pain as needed, and she also experienced symptoms of depression due to her inability to return to full functioning following her surgeries. She attempted to return to work again in September 2003, but she developed work-related anxiety and also continued to experience pain from the seroma. She quit working, and her symptoms improved with decreased activity. She was babysitting her granddaughter, and was "doing fairly well" with regard to her "anxious depression." A.R. 224. By November 2003, she was able to control her pain symptoms with over-the-counter medications; however, she continued to complain of chronic abdominal pain and irritable bowel symptoms. Her anxiety and depression improved with medication. Fink saw her family doctor on November 14, 2003, for followup of chronic sinusitis. She had "a little swelling in her legs," but she did not complain of back or leg pain, and notes indicate she was "off most of her medications," including antidepressants. The doctor prescribed a trial of Lexapro, a different antidepressant. A.R. 222.

In December 2003, a state agency consultant reviewed the record relative to Fink's mental impairments. He found that Fink's depression and anxiety created moderate restrictions of her cognitive functioning, but not at a Listing level of severity. He noted Fink was able to perform self-care functions, travel independently, interact with others appropriately, and watch television with good memory and comprehension of what she viewed. However, he noted Fink exhibited "variable sustained attention and concentration" that would cause her difficulty in consistently understanding, remembering, and carrying out detailed instructions for prolonged periods of time. A.R. 202.

In January 2004, a state agency consultant reviewed the record relative to Fink's physical impairments. He noted Fink was morbidly obese at 5'1" tall and 297 pounds. She could drive a car, shop, and run errands; stand for one-half hour at a time; walk a couple of blocks; and sit without limitation. The consultant noted Fink complained of pain in her back and knees, and had been diagnosed with degenerative joint disease of her right knee, but she ambulated without assistive devices and used only over-the-counter medication for pain. He opined Fink should be able to lift up to twenty pounds occasionally and ten pounds frequently; stand and/or walk at least two hours in an eight-hour workday; and sit for six hours in a normal workday. He recommended she never climb ladders, ropes, or scaffolds, and never crawl, but he opined she otherwise could perform all postural activities occasionally. He also suggested Fink should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

On July 23, 2004, Fink saw her family doctor complaining of occasional bowel incontinence, particularly after eating. She stated the problem had been occurring for over two years but she had not mentioned it previously because she was embarrassed by it. An MRI of her lumbar spine on July 30, 2004, indicated no neural impingement, some degenerative disc disease, and mild levoscoliosis. A handwritten notation on the MRI report reads, "Disk disease not enough to account for incontinence. Could try ESI for pain

- wants to wait." A.R. 310. Other than these entries, there is no medical evidence of record indicating Fink has any neurologic problems or primary colon problems, nor is there evidence that she sought treatment for bowel incontinence either before or after this visit. Although the record indicates she was suffering from urinary incontinence prior to her hysterectomy, there is no further evidence that the problem continued following the surgery.

Fink saw her family doctor on February 15, 2005, complaining of a recurrence of pain in her lower abdomen. She denied any back pain at that time. She also complained of increasing symptoms of depression, stating her husband had lost his job, his unemployment benefits were nearing an end, and she did not know what they were going to live on. The doctor prescribed antibiotics and increased Fink's Lexapro dosage. He recommended she obtain a surgical consult for her recurring panniculitis, and Fink stated she would "think about this." A.R. 330. She returned for followup on February 25, 2005, and notes indicate her panniculitis had resolved. The doctor suggested Fink "may be a candidate for gastric bypass," which he believed would decrease her risk of recurrent panniculitis. A.R. 329. Fink's abdominal problems continued to do well through June 2005, according to her family doctor's notes.

On January 6, 2006, Fink's family doctor completed a Lumbar Spine Residual Functional Capacity Questionnaire. He indicated Fink's x-rays showed degenerative disk disease, and she experienced pain with straight leg raising, lifting, and twisting. He further indicated that emotional factors contribute to the severity of Fink's pain. He opined Fink could sit for thirty minutes at a time and stand for fifteen minutes at a time before needing to change position, but he failed to express an opinion regarding the total time she could sit or stand during a workday. He also opined Fink would need to walk around every fifteen minutes for two minutes at a time, and she would require a job that permitted her to shift positions at will from sitting, standing, or walking. He opined she

5

would need to take ten-minute breaks every thirty minutes, and if Fink had a sedentary job, her legs should be elevated 50% of the time. The doctor indicated Fink could lift less than ten pounds frequently, ten pounds occasionally, and twenty pounds rarely; stoop/bend, crouch/squat, and climb stairs rarely; and never twist or climb ladders. He indicated she would have no limitations with reaching, handling or fingering. The doctor opined Fink would have good days and bad days, and she likely would miss work about four days per month as a result of her impairments or treatment. The doctor indicated Fink's symptoms and limitations as set forth in the questionnaire began on July 23, 2004.[2]

The ALJ found Fink to have severe impairments consisting of "degenerative disc disease, degenerative joint disease, morbid obesity and depression as well as a history of irritable bowel disease, abdominal seroma and asthma." A.R. 23. However, he found her impairments did not meet the Listing level of severity, either singly or in combination. He posed a hypothetical question to the vocational expert ("VE"), including the limitations the ALJ found to be credible, including the ability to lift twenty pounds occasionally and ten pounds frequently; stand for thirty minutes at a time for a total of two hours in the workday; sit for thirty minutes at a time for a total of six hours in the workday; walk one block; perform non-exertional maneuvers such as balancing, stooping, kneeling, and climbing stairs occasionally, but never climb ladders and never crawl; avoid exposure to extremes of dust and fumes; and perform only simple, routine, constant tasks, with occasional changes in the routine work setting and occasional interactions with the public. With those limitations, the VE indicated Fink could not return to any of her past relevant work, but she would be able to perform some sedentary, unskilled jobs, such as surveillance monitor, document preparer, or addresser. If she also would have to take

---

[2]The court notes the record also contains a Comprehensive Mental Health Assessment for a patient other than Fink. *See* A.R. 339-345.

unscheduled rest breaks of five minutes each per day, miss three or more days of work per month, or be unable to sustain an eight-hour workday, then she would be unemployable.

The ALJ gave little weight to the January 2006 opinions of Fink's family doctor regarding her functional limitations, finding the doctor's opinions to be "largely sympathetic to the claimant," and not fully supported by the evidence of record. Based on the ALJ's assessment of Fink's residual functional capacity and the VE's testimony, the ALJ found Fink could not return to her past relevant work, but she could perform other sedentary, unskilled work, and she therefore was not disabled.

Fink argues the ALJ erred in giving too much weight to the opinions of the state agency consultants and in finding her subjective complaints not to be fully credible. Although the record contains some evidence to support Fink's subjective claims regarding the severity of her limitations, substantial evidence supports the Commissioner's decision that Fink was not disabled, at least through the date of the ALJ's decision. The court concurs in the ALJ's conclusion that the opinions of Fink's family doctor regarding her functional capacity are inconsistent with the doctor's own treatment notes and the other substantial evidence in the record. There is no doubt that Fink suffers discomfort and some limitations from her impairments. However, the evidence does not support her claim that she is totally unable to work.

The Commissioner's decision is **affirmed**, and judgment will be entered for the Commissioner and against Fink.

**IT IS SO ORDERED.**

**DATED** this 17th day of April, 2009.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT